Thank you. Please be seated. This next case is case number 4-17-0001. Crystal Young and Michael Young v. Courtney Herman and David Herron. And appearing for appellant is Attorney Jeffrey Lindsey and for the appellee is Attorney Gina Wood. Good morning. Mr. Lindsey, are you ready to proceed? Yes, sir. You may. Your Honors, my client was here this morning but didn't know whether she should keep her motions contained. This case is about an abuse of the domestic violence statute to gain leverage in the custody proceeding, which resulted in the judicial kidnapping of a minor child from a biological mother and separating the minor child from her only sibling. All without any evidence of abuse or voluntary relinquishment, such that at the time the case went to trial, the GAO, after $18,000 in fees, could not report whether one house was superior to the other, but that the minor child was clearly happy and comfortable in her mother's house. The GAO petition for fees, April 3, 2017, GAO report, page 8. The facts in this case present the exact reason the law requires third parties to prove standing before reaching the issue of best interest. The standard requirement is designed to safeguard the natural parent's superior right to their children. Separate hearings on standing and best interest is clearly the better procedure. The process of having both of these issues at the same time is divergent from the burden created by the rebuttable presumption and undermine any claim that the issue of standing was actually heard. In this case, the proceedings at best were muddled. There is no right more sacred in our society than the fundamental right to our children, protected by the Constitution of the United States. The legislator has adopted safeguards for this fundamental right. It is known as standing. It is striking in this case that based on their own verified petition for order of protection, filed December 4, 2015, the minor child was in the biological mother's custody since October and the grandparents were receiving visitation, C-16. As such, the appellees, paternal grandparents, did not have standing in this case to bring a petition for grandparents' visitation, let alone a petition for custody. The issue is whether at the time of filing their plea, which was December 2, 2015, C-9, the issue is whether at that time a mother had voluntarily and indefinitely relinquished physical custody, such that the minor child was not in the physical custody of her mother at that time. The overwhelming documentary evidence in this case supports the conclusion that mother was not only actively involved in her daughter's life, but she's the one who went to all the medical treatments, she made those decisions. But that's not the conclusion the trial court reached. It is not the conclusion the trial court reached, Your Honor. So when you say the overwhelming documentary evidence, wasn't all the evidence the parties had presented to the trial court? It was, Your Honor. Isn't our standard review, whether it's court's findings was contrary to Memphis' weight in the evidence? No, Your Honor, this is de novo review because it's an issue of law, it relates to standing. And therefore, those factors are what this court must consider. You mean the trial court, we're supposed to decide whether these factors are present, not the trial court? If the court must get to the issue of best interests, then the court must, this court must review all of the facts in the case on a de novo standard to determine whether the facts, the evidence, and the testimony in this case under a de novo review. What case so says? In terms of the de novo review issue, Your Honor, the issue of standing is de novo review. What case so says? Issues of law, Your Honor, are decided on a de novo standard. Isn't this an issue of fact, whether or not this child is in the custody, the physical custody of a parent? It is, in a way, an issue of fact. However, by reviewing... I don't understand what that means. By reviewing the record, the issue is whether or not, the first issue is whether or not a parent who, by affirmative affirmation of the appellate grandparent, the appellee grandparents, state that a child is in mother's custody since October when they filed the petition and were receiving visitation, that issue is what this court must determine in terms of whether or not there was standing at that time. I believe that the facts in the law support the fact and the decision that this case should be remanded based solely on the purpose of the issue of standing because the child was with mother since October. Did the court address that by finding that although the child was in the physical possession of the mother, she was in the physical custody of the young? I think the court concluded that an error, that a unilateral exchange in October of that year was determined. And the court's ruling was that, okay, so what? They waited until December to file their petition. My point is that there's no basis in law that would support that conclusion because... We do agree that there are a number of cases that distinguish physical possession. There are, yes. Yes, but the one case that counseled that when a child is removed from the grandparents, right, and so this argument that a grandparent can get to the issue of best interest when a child is removed, the filing was four days after this unilateral exchange, okay? Why is that different from this case? It's different because this child, for over 30 days, was with mother. It stands for the proposition in our great judicial system that there must... That that is an acquiescence. This child at this point, you can quit smoking in 30 days. A child at this point, and I'm saying that the facts don't support the conclusion if we have to get to that. But we don't have to get to the abuse of discretion in terms of factual issues that came in outside the bounds of reason. All we can... The easy and the appropriate remedy is, hey, you didn't file this within a reasonable amount of time. That lends to the argument that this was okay. This was the way it was. This was more in line with what the child was used to because the child's still going to school. The child is still participating in extracurricular activities. They're having a visitation. True. I believe so, yes. But my point is I think the court was distracted. If we want to spend our time on those issues, we will. The court did not hear the issue of standing. And by combining the two issues, it caused for an impediment to the due process, writes my client. For the standing, there's no requirement under the statute that the person bringing this petition must demonstrate typical standing, that he or she has a particular interest in it. The requirement is that this petition may not be brought, may be brought by a person other than the parent, but only if the child is not in physical custody of one of her parents. That's the threshold requirement. Correct. But if that's, if that requirement is present in a given case, there's no statutory requirement talking about who may bring such a petition to seek custody, is there? I'm sorry, Aaron. I didn't understand. Assuming in an appropriate case that a child is the subject of petition for allocation of parental responsibilities is not in the physical custody of one of his or her parents, the statute doesn't talk at all about who may bring a petition for allocation of parental responsibilities if that threshold is crossed, does it? No, I think the statute provides that any person that can get over that threshold issue may seek custody of a child. Okay. And so, therefore, this isn't, normally in a standing issue, the issue focuses on the person bringing the action. Who are you? What's your interest in this case? Why are you doing it? Correct. This is a different sort of statute where it doesn't address that at all. Seemingly anyone could bring such an action seeking an allocation of parental responsibilities if the threshold has been crossed, which is that the child is not in the physical custody of one of his parents. Right. Okay. So, that being the case, the determination of whether or not that threshold was crossed is to be resolved at trial or at least a hearing on that issue. It's a fact question, is it not? Namely, is this child in the physical custody of one of his parents? Correct, Your Honor. Okay. Isn't that what the trial judge did here? No, Your Honor. The trial judge didn't conduct a hearing on that issue and make its findings? We conducted a hearing that included both the issues of best interests and the issue of standing. And because of that, the issue of standing was muddled and the statute says, and the case law that I addressed says that that is reversible error if there's any prejudice that can be gleaned to the respondent. That's an in-ray BS. An in-ray BS was a termination case. Correct, Your Honor. In termination of parental rights, you have to have first finding of unfitness, then a separate hearing to determine best interests. You've muddled this by putting these two together. In fact, you cited a number of cases that were either adoption cases where parental rights were being terminated, in-ray the adoption of C, S-Y-C-K, People v. William W., which is in-ray BS, in-ray AP, and in-ray BR, all of which were terminations of parental rights cases. Those are significantly different than the situation we have here. In fact, you cited in-ray BS specifically for the proposition that what the judge did in this case was reversible error, and that's not the case at all because that's where an unfitness finding and a best interest finding are both being held at the same time. That is not what we have here. Another way, why can't the judge entirely within the court's discretion decide, I'm going to address the question of whether the child is in the physical custody of one of her parents, which is the threshold question that must be proved, and if I find that the child is, I'm going to also hear evidence with regard to what would be the best result in this case regarding allocation of parental responsibilities. And I think that would be appropriate because there is a definitive time, a moment in time that we are concentrating on, which is the time around when this pleading was filed. In this case, there's testimony and evidence five days going back ten years, all irrelevant, and objections were filed and argued. The point being is, if we're talking about that issue, then if we're going with the abuse of discretion, all of the factual evidence stands for the fact that mom was involved in her daughter's life to some degree. Even the trial court in his own ruling said primary custody was by grandma and grandpa. That's disputed, but that in itself is a judicial determination that mother was at least to some extent in the child's life, and that's all there has to be. We dispute that determination, but my point is that this case should be resolved and can be resolved on the issue of standing. And if we want to talk about the fact that the judge considered a DUI prior to the birth of the child, the fact of immunization, whether or not the child was immunized or not, irrelevant. What does it matter except if you take the conclusion that the trial court said that the youngs were in charge of this child since birth, and then came into court and said the child hasn't been immunized, and so therefore my client, and that was concerning for the court. Well, it should have been concerning to the petitioners, to them. It's evidence that they weren't good parents. If they... Is that relevant in the court's determination of custody versus possession? Well, that's just it. We argued five days on everything going back ten years, and that's where the prejudice took place. I'm confident that if the court wasn't distracted by counsel's eloquent ability to throw up everything that they could possibly get to stick and distract the court with all these irrelevant... Distract the court from what? I'm not sure I understand. The issue of where has this child been living. That's exactly the point. You're trying to narrow it to a very small period of time and say, as long as I've got possession of this child at the point in time when the petition is filed, you're out. No. It isn't. In fact, that's what those cases are about, is the fact that, well, you have to take a look at what constitutes possession versus custody. Because if we take your rationale, whoever gets the child immediately prior to the filing of the petition is the winner. Right. And I agree that that is not an appropriate standard because that would encourage abductions of children. So in this case, wasn't it necessary for the court to look at a broader window of time since you were talking about, well, since October the child's been with the mother and we're now in December. So the court, isn't it reasonable to believe the court had to look at a broader period of time to determine what in fact constituted custody versus possession? What were the true intentions of the mother over a longer course of time with regard to who was going to retain custody of the child? Now, I will say, my belief is if I was sitting where you gentlemen, your honors are today, I think 30 days is the appropriate window. Why is that? Because within 30 days, the child has adjusted to whatever it is she's doing. If mother is completely, which is not the case here, if mother is completely absent from a child's life for whatever reason, but comes back and initiates and is involved and is there, then that's all she has to do. She doesn't have to be a great parent. She just has to be there. So under your rationale, let's say the mother never met the child in her life. As long as she was with her for 30 days, did nothing else but just had her in her presence for 30 days, that's it. Right. That's all that's needed. Yes, and because the person who was that parental figure has acquiesced. Well, no, let's assume we don't know that, and the trial court wouldn't know that. Unless they heard evidence of how the circumstances arose. Right, and that's why it's important, I think, for the court to acknowledge the fact that by their own pleading, they said the child's been with mom. So under your logic, if the parent gets the child, never having had any experience with the child before, and keeps the child out of reach for 30 days, that's all that's needed. Yes, and I think that's rational. Because the fact is that if this actually happens, if the child is actually removed from a parental figure, that party is going to respond within four days, this court has said, and that is determinative because there is a disruption. There is a change in circumstances, and that parental figure is going to say, no, this is not happening. I'm going straight to the courthouse, especially with people with means of over $400,000 a year. They would have been there immediately. But no, they acquiesced, and they were receiving visitation. So there's no standing, even on the issue of visitation. And, you know, I'm here today to fight for the rights of an indigent party, and this court has the power and the duty to correct this injustice. The easiest way is through standing, but the facts themselves support the fact that this child was with her mother at court determination, at least to some extent. And that's all that's necessary. She was involved with school. She was involved with the teachers. The teachers said, the GAL said that she's loved. It's a boisterous home. She feels comfortable in her mother's house. If there was this division, if there was this separation, there wouldn't have been that relationship. Mom filed her on her tax return. She had medical insurance. She went to all the doctor's appointments. According to the doctor's, the pediatrician's testimony, the next-door neighbors said, I saw mom with daughter every day. The young's own son said, I was living at home. Thank you. All right. Thank you, Mr. Lindsay. You'll have time in rebuttal. Thank you. Ms. Wood. Good morning, Your Honors. May it please the Court, Counsel. I respectfully disagree with Counsel's statement before this Court that the proper standard of review is one of de novo. I believe our appellate case law here in the State of Illinois is clear that a trial court's findings, the facts are subject to review for manifest error. A trial court has broad discretion in awarding custody and parenting responsibilities, and such an award will not be overturned except when it is in the manifest weight of the evidence, against the manifest weight of the evidence, manifestly unjust, or there is a clear abuse of discretion. And notably, as this Court today has already pointed out, there is a strong and compelling presumption that the trial court, the entity closest to the litigation, has made the proper custody determination. Generally, a reviewing court will not disturb the trial court's determination of credibility, because the trial court has a superior vantage point, which cannot be reproduced from the cold record, to observe and judge the witness's demeanor and credibility. The trial court is, therefore, in a better position to evaluate credibility, temperaments, personalities, and capabilities of both parents. I would suggest to you, in all of my years of practice, trial court proceedings that have been transcribed into a cold record, and reviewing that, sometimes we can see from that cold record, well enough, what has transpired, to determine how the trial court made its determination. I would suggest to you, in this case, being present for the proceedings that took place over five days, just on the remaining issues alone, was paramount to the trial court's determination. The scene of the facial expressions, the demeanors, the gestures, the tone and intonation of how folks conducted themselves within the courtroom was paramount. There was a substantial amount of evidence provided to this judge. It looks as if, today, we're faced with two major issues before this court, and that is, one, whether or not the trial court made a proper finding in reference to standing, and handled that procedurally in the correct way. And then, two, if that is accepted, whether in fact the trial court made a proper determination to allocate Journey's primary care responsibilities to the youngs. In terms of standing, I disagree with counsel's argument that that issue must be bifurcated from the best interest portion in a family court proceeding. There is no authority that supports that. In fact, the Brownfield decision, which comes out of this district, specifically stated in that case that the trial court's determination to handle the standing issue alongside all remaining was proper. There was no prejudice to the parents in that case by doing so. And I suggest that that's because the evidence regarding those issues is so completely intertwined and necessary in order for the court to make a comprehensive determination in regard to the facts necessary of which the law can be applied. I also note in my brief that one thing that did not occur in the trial court pointed out in this case is that the appellant did not object to standing or raise upstanding as an affirmative defense in the proper time for pleading. Mind you, because standing is part and parcel to 602.1 proceedings, I'm not sure that was a great defect. However, I do believe it falls contrary to counsel's argument that there needed to be a separate hearing because counsel and his client never raised an objection to standing through an affirmative defense. The court found that that was an improper way to handle that issue, but nonetheless did deal with standing very specifically over the course of those five days. I didn't understand what you just said. When you said the court found it was an improper way to deal with that issue, what was an improper way? How counsel for the appellant chose to object to standing, filing a motion to dismiss the proceedings, suggesting that the court needed to have some type of bifurcated proceeding during the trial court proceedings when, in fact, the appellant had never filed an affirmative defense related to standing. That was never brought to the court's attention in that regard. I mean, their motion to dismiss was based on that standing issue, wasn't it? It was based on the standing issue, but the requirement that predated the motion for the appellant would have been to file an affirmative defense within the time for pleading. I don't understand. You mean under 2619, before someone can file a motion to dismiss, claiming that the affirmative matter is that there's no standing, that you have to file an affirmative defense? I believe with this type of standing, you do, Your Honor. This is not the type of standing that relates to legal capacity or the type of things we see under 619 standing. This relates to the physical custody standing that we've been talking about earlier today and that is outlined within our briefs. That standing is part and parcel to 602.1, and I believe the case law is clear that that is to be raised if there's a concern that standing does not exist as an affirmative defense within the time for pleadings. However, this trial judge properly determined that although that hadn't happened, there would be a hearing on standing simultaneously with best interests. That was proper. Brownfield supports that, and it makes sense that all of that evidence was heard together. We also know that for the standing issue, there are requirements for the court to determine, even if, in fact, standing hasn't been waived per party to the case, the first being who is responsible for the care and welfare of the child prior to the initiation of the proceedings. And so counsel today is suggesting there is some time limit for that, a four-day time limit, because one case actually put a quantifiable number on the days before a litigant proceeded with third-party custody litigation. There's no time limit. I would suggest that's purely and exclusively within the discretion of the trial court to determine whatever time frame may exist, whether it be an hour, four days, four months, how that would relate to standing and physical custody. In this case, there was testimony at trial by the Youngs as to why, from October 25th to December 4th, there hadn't been a filing by them. They indicated they were hoping they could work things through with Courtney Herman. They were hoping they could keep the peace. I don't believe trial courts nor reviewing courts want to encourage people to race directly to a courthouse the minute there is conflict with a child before attempting to work through that process together. That process within that 30-day time frame did not work to Jurnee's benefit, and so litigation was pursued by the Youngs, and properly so. And when the court heard what had occurred, it properly entered an order of protection to keep this child's life from being overturned after almost ten years of living with the Youngs. I would agree that our state properly protects the fundamental right to raise your children. However, we also have many cases that state that that right is not absolute. A child is a precious gift, but with that gift comes an enormous amount of responsibility, commitment, time, worry. Courtney Herman chose to turn over those responsibilities to her daughter, to the Youngs, shortly after this little girl was born. And the trial court determined, properly so, based upon the significant evidence presented to it, that the Youngs had really provided everything for this child. Not only her daily care, but also had handled all of her medical care, her educational care, her tutoring through Sylvan and Skills Sprout in the reading program, her extracurricular care, her spiritual care, everything that's part and parcel to being a parent. That was handled by the Youngs. And Judge Yoder even made a statement that said he believed that the reason Courtney Herman was involved to the extent she was, because that was forced by Crystal Young, who ensured that there was a relationship facilitated between this mother and this child. Who also, alongside her husband, ensured that David Heron had a relationship with this child. All of the things that we want custodial caregivers to do for a child. And so when a biological parent steps in after that length of time where a child is flourishing and being raised in a loving, nurturing home where there are parties who are dedicating their time, their resources, their love, everything to this child. Wants to trump that, essentially out of the blue, for self-serving purposes and use the parent tie as the trump force, that's exactly what 602.1 is designed to protect children. Does the record show what happened after nine and a half years to blow up this situation that had previously existed? The record shows that when the Apollons and the Apolly Crystal Young were at the child's bus stop, Courtney Herman approached Mrs. Young and indicated, you're not going to see this child anymore. And I've cited in my brief to some of the statements that were provided in testimony. A lot of profanity, a lot of arguing, took the child's phone, said you're not going to contact her, she's not going to contact you. Ultimately, the Youngs learned that what Courtney wanted to do was move the child to the state of Florida. I don't know if this was a knee-jerk, I'm now going to be this child's mother, immature decision. The record contains no information as to what spurred this? No. Okay, that was my question. Yeah, other than she wanted to leave the state and she decided she wanted to be the primary caregiver to this child. And it's our position that's exactly what 602.1 is designed to prevent, that your parental tie does not, using the same word again, trump what's necessarily in a child's best interest. And of course, folks will say this is an age of blended families now. Different kinds of caregivers are providing care for children. I would suggest that's probably been going on since the beginning of time. Grandparents, aunts, uncles, neighbors, friends, whomever may be raising a child. What's important to the nurturing of that child is what the Youngs have done for this child since the beginning. They have done all of the heavy lifting. So when counsel states that his client was involved, the record is clear, her involvement was because Crystal Young encouraged and in some cases made her be involved. There also with the credibility issues, when we talk about credibility, there were a couple things in this proceeding that stood out as being very significant when we're trying to believe what was really happening over the course of this 10 years. The first relates to the medical records that were presented by Courtney Herman to the trial court. Ironically, her Exhibit F, listed on its fax page from the custodian of records, and I believe there were 68 pages faxed to her. The document presented to the trial court consisted of 67. The 26th page, which was missing, was the page that talked about how the pediatrician, it was located by the Youngs, they had made appointments with her to get this child well baby care after learning that they believed Ms. Herman had been lying to them about the kind of baby care this child had been receiving. Dr. Rosa put in those records that she'd been advised by Courtney Herman the child had all of her immunizations, she'd seen Dr. Saxena, she'd been to the health department, Dr. Rosa reached out to get those records, none existed. That document was missing. That was concerning to the court. The second document that was very concerning was this lease that was provided to the child's school. Now Ms. Young and her mother denied that either one of them had provided that document, but this document was provided nonetheless. What kind of document? It was a lease that was presented to the child's elementary school, presumably for the purpose of allowing her to attend that elementary school. It was identical to a lease that Courtney Herman had executed with a different apartment within the same subdivision a year prior. Everything was identical. If you compare the two, the initials are the same, the signatures are the same. Everything is the same but for the date it was executed and the address. What's the significance of the lease? Lying. Fraud. There was fraud perpetrated upon this school. That was a falsity that was presented to the school. There was a document, a legal document, a lease that was doctored, and our trial court was concerned about that. It goes to truthfulness. What did the trial court say about it? The trial court stated that it was concerned that documents had been doctored in this case. Now the two documents that were presented that would fall within that category were the medical records I just discussed and the lease. You heard Mr. Lindsay make reference to the GAL's report. What is your position regarding that? The guardian ad litem, I believe, did a thorough job interviewing different individuals. The guardian ad litem did not give a compelling recommendation other than she believed that Journey wanted to have things the way they are, which the way they are at the time of these proceedings and for nine months prior to final hearing was living primarily with Beyonce. So how did the trial court view those recommendations and how should this court view them? I believe the trial court considered the GAL's recommendations. I couldn't speak for the trial court, but after reading the trial court's order and hearing the trial court's oral rulings that were provided to us in person, I believe the trial court made its determination more on the evidence presented to it. And that determination was clearly also based upon the demeanor and the credibility of the witnesses presented. One of the things that Courtney Herman was trying to suggest at trial was that, in fact, the Youngs were lying about the amount of time Journey spent with them. The Youngs presented very detailed testimony that this child was in their care most of every week. That testimony was actually corroborated by Courtney Herman's own witness, Derek Reby, who testified that the Youngs were at the bus stop every morning and every afternoon, which would make no sense if this child were staying in her mother's care. It was corroborated by their neighbor, who was not their friend, who did not have a vested interest in the litigation, who said, Courtney Herman's testimony was also refuted by that of her sister and her mother, who didn't make mention of the amount of time the child spent with the Youngs at all, and actually contradicted one another, as I outlined within my brief. And so I believe Judge Yoder put most of the stock within what he observed, what he saw, and what was going on within those trial court proceedings, in addition to other documentary evidence that was presented. So with that, Your Honors, I'd leave this at, this is a wonderful child, and I agree with counsel that we do not want to tread lightly on a parent's right to raise his or her own child. But when you have a situation such as this, where a child comes into the world, within a few months, the reins, for lack of a better word, are turned over to a third party to raise that child, and that occurs for the substantial period of time. The bulk of this child's minority at the time of trial, within the care of a third party, and that child is flourishing. All the bases are covered and then some. And on top of that, has a wonderful relationship with her biological parents, as facilitated by the grandparents. How can Courtney Herman expect a trial court to deny that lifestyle and that love for this child, simply because she raises the, I'm the parent, card? And I don't mean to sound disrespectful to her when I say that, but this gift, as we talked about earlier, comes with a huge amount of responsibility that Courtney Herman chose to hand off to the youngs. Thank you. Thank you, Ms. Wood. Mr. Lindsley, rebuttal. Thank you. In relating to the medical records, if you look closely at the cover sheet, it says there's 68 pages included in this fax. And if you look up in the upper right-hand corner, there's one through six, there's one through 67. So one document didn't transmit through the fax machine, and that explains whatever they're alleging was missing. The lease is obviously a copy of what was taken, the holes are there where it was filed. It's obvious, you know, it doctored. But the testimony was that Mom had never seen it before. The testimony was Mom says, I've never submitted a lease before, why would I do it again? I just take this one piece of paper in and then give that to them. And it was Ms. Young who testified, she's the one who actually took this information to the school, but yet she didn't look at it. I do believe this issue should be and can be, and the court's duty is to resolve this on the issue of standing, but I also feel at this point necessary to address certain factual issues. The question is, the ultimate question, whether Mother directly provided for the child's care, welfare, or participated in the child's everyday life. The overwhelming physical evidence in this case, health insurance, C-344. Food, C-346. Housing, C-407. Enrolled her in school, in her own school district, which is a different school district than the Young's. C-347, participated in school functions based on the teachers through the GAL report. She signed her up for these things. Courtney had a bassinet and a crib for her daughter. The Young's never had a bassinet or a crib. They didn't have a room for her at their house until 2009. Let's look at... I don't understand. What's the point of that? That's eight years ago. What point are you making? That is my argument. If we're going with a credibility issue, it's beyond reason to believe the Young's when they say they took care of this child for this girl's entire life when they didn't even have a bed for her. That the child, that a pediatrician is going, a large pediatrician is going to sleep with an infant, it defies all logic. But let's get to the determinative testimony in this case, that the petitioner's own son, so this is the Young's own son, testified that when he was living with them from 2005 to 2007, Journey was not living there. That Crystal says that in 2008, she started spending some more time with them. That Crystal said that from 2009 to 2015, the arrangement was if Courtney called and said, well, if you've got nothing, you can come pick up Journey and I would go get her. Volume X, page 77. Mr. Reby testified that he lived across from Courtney from 2010 to 2014. He saw Courtney and Journey almost daily. He saw their daughters would play together, have sleepovers, that his daughter would sleep at Courtney's with Journey, and his daughter liked the way Courtney cooked catfish. That the other neighbor said that from October 2011 that she was out in the morning with Courtney every morning and she thought it was ironic because it was just Courtney and her with all these kids running around the complex. And it was just Courtney and her with her daughter. The summers, the BNAP program, Journey was with, Courtney was with Journey throughout the summers through the program. These are all specific testimony that third parties, reliable parties, testified to and this was the evidence. Autumn Herrera, 2011, 2015. Every morning, present with her daughter and Courtney. Crystal, she picked her up from school more often in 2014. There's no question that these people had some time with their daughter and that they provided transportation and took her on lavish trips. But my gal fostered that relationship and she never relinquished. All the documents, the pediatrician says mom was there every time. The facts don't support the conclusion. And this court has got to remedy this. And I'm asking this court to look at the facts, look at the issues, apply the law and the law is that this child was in the physical custody of her mother because that's what the evidence is. That's what it was. And we're asking the court to return the child to the mother and remand the case because that's the right thing to do. And thank you. All right, counsel. Thank you both. The case will be taken under advisement, a written decision, and the court stands in recess. Thank you.